UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* Eric Fields, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14 CV 1321 RWS |
| | ) | |
| THE BI-STATE DEVELOPMENT | ) | |
| AGENCY OF THE MISSOURI-ILLINOIS | ) | |
| METROPOLITAN DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Relator Eric Fields ("Fields") brings this *qui tam* False Claims Act action against

defendants the Bi-State Development Agency of the Missouri-Illinois Metropolitan District ("Bi-

State") and Eager Road Associates, LLC ("Eager Road").  Fields alleges that Bi-State and Eager

Road made false claims to receive federal public transit funds through the Department of

Transportation ("DOT") and the Federal Transit Administration ("FTA").  Defendant Eager

Road has filed a motion to dismiss the case against it for failure to state a claim.  Defendant Bi-

State has filed a motion for summary judgment.  For the reasons that follow, I will grant in part

and deny in part Eager Road's motion to dismiss and will deny Bi-State's motion for summary

judgment.

## Background

Fields brings this *qui tam* action in his capacity as a former Bi-State employee.  Fields

worked as an engineer for Bi-State from 2003 to 2012.  On July 28, 2014, Fields filed this suit,

alleging that defendants violated the False Claims Act, 31 U.S.C. § 3729, *et seq.*, by falsely

certifying compliance with federal law in order to receive federal public transit funds.  Fields

alleges that Bi-State falsely certified compliance with the Hatch Act[1] and the Uniform

Relocation Assistance in Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.* ("Uniform Relocation Act").

Hatch Act Allegations

Fields alleges that Bi-State violated Hatch Act prohibitions on employee participation in certain political activities. Fields alleges that the Hatch Act was violated by Bi-State executives when they raised funds for the re-election campaign of St. Louis County Executive Charlie Dooley, as well as campaign funds related to the increased ½ cent transportation sales tax rate in St. Louis County. Fields also claims that Bi-State employees were ordered to "volunteer" for both of these campaigns. Fields claims Bi-State executives solicited donations for Dooley's campaign from him, and asked him to solicit campaign contributions from others. According to Fields, Bi-State then falsely certified to the FTA as a condition precedent to obtaining federal funding that it was in compliance with the Hatch Act.

Uniform Relocation Act Allegations

Fields also alleges that Bi-State falsely certified that it was in compliance with the Uniform Relocation Act's requirement that federally-funded entities appraise real property before acquiring the property. Fields alleges that Bi-State failed to appraise the Meridien parking garage in Brentwood, Missouri before it acquired Eager Road's one-third interest in the garage in 2010. Fields alleges that Bi-State paid above market value for Eager Road's interest as part of a scheme to defraud taxpayers and the federal government all designed to benefit Eager Road. Fields alleges that Bi-State did this as a direct result of Dooley's influence.

---

[1] Fields fails to cite to any particular provision of the Hatch Act. I presume that Fields asserts his claims pursuant to 5 U.S.C. §§ 7321-7326.

Finally, Fields claims Dooley wanted to help Eager Road because its principal, Don Musick, was a top contributor to Dooley's campaign. Fields alleges that Dooley was able to coerce Bi-State into making the deal with Eager Road because, as St. Louis County Executive, Dooley had discretionary authority over St. Louis County's appropriation to Bi-State and Dooley threatened to withhold funds from Bi-State unless it made the deal.

The facts, as alleged by Fields, are that sometime before 2003, the City of Brentwood, Missouri, established a redevelopment area near Eager Road and Hanley Road. Brentwood selected Eager Road Associates to redevelop the area. In November 2003, Eager Road proposed building a garage for joint use by Bi-State and the redevelopment area. Eager Road proposed building the garage for a price of $18.8 million. Bi-State declined the offer because of the high price, but proceeded to condemn land necessary to build a parking lot and eventually a garage, if demand materialized. Whether demand would materialize was questionable because St. Louis County was constructing a large garage along the Metrolink line at another station which was only a few miles away. Fields alleges that during condemnation proceedings, someone from the Dooley office called and ordered then-Bi-State CEO, Larry Salci, to enter into a sole source deal with Eager Road to build the garage. Salci refused the offer because recently constructed and competitively bid garages showed that Musick's prices were between $4.6 million and $6.45 million too high.

In the spring of 2005, Dooley held up approving Bi-State's fiscal year 2006 budget until Bi-State entered into a sole source contract with Eager Road for the construction of the garage. Bi-State then entered into a sole source agreement with Eager Road for the construction of the Meridien garage. Under the contract, Bi-State owned two-thirds of the garage and Eager Road

owned the remaining one-third. The cost to Bi-State was approximately $14 million. Construction was completed and the garage opened in May 2007.

Over the course of the next few years, Musick served as chair of the Board of Directors of the Metrolink expansion support group, Citizens for Modern Transit ("CMT"). Former Bi-State CEO Bob Baer and current Bi-State CEO John Nations were also members of CMT. Through Musick's participation in CMT, he became aware of Bi-State's strained financial condition as well as its ongoing need and applications for federal funding.

In 2008 and 2009, Eager Road was not able to meet the "lease-up" conditions of its financing agreement with its bank, and the development went into default. In March 2010, Eager Road's financing bank pursued legal action against the personal guarantees issued by Eager Road members, including Don Musick. The bank sought $11.6 million from Musick and others.

In April 2010, Eager Road and Bi-State received notice that Eager Road's one-third interest in the Meridien garage was being set for a delinquent tax sale by St. Louis County. The tax sale was scheduled to take place in August 2010.

On April 1 and April 2, 2010, Musick contributed $26,200 to Advance St. Louis, a campaign committee established to promote the passage of a transportation sales tax increase in St. Louis County (Proposition A). This committee was run by then-CEO of Bi-State, John Nations. Proposition A passed on April 6, 2010.

On May 24, 2010, Eager Road offered to sell its one-third interest in the garage to Bi-State directly rather than proceed with the tax sale. Dooley, in an effort to help Musick, allegedly influenced the St. Louis County Director of Revenue to cancel the mandatory tax sale of Eager Road's interest in the garage. It is also alleged that Dooley influenced the Bi-State

Board of Directors to approve the purchase of Eager Road's one-third interest in the garage, despite the fact that the garage was underutilized and the purchase did not provide Bi-State with any additional benefits. On October 22, 2010, Bi-State's Board approved the purchase of Eager Road's interest at a price of $5.8 million. Fields alleges that the purchase price was grossly inflated above the price at which Bi-State could have obtained the garage through the tax sale (which Fields alleges would have been approximately $600,000).

Fields alleges that Bi-State received more than $94.4 million in federal funding in 2010 and 2011 which it could not have received but for Bi-State's false certifications that it was in compliance with federal law requiring an appraisal. Fields further alleges that Bi-State, as well as Musick, knew that the inflated purchase price could not have been supported by an appraisal because the garage was slated to be sold at the tax auction at a much lower price, and because Bi-State had already invested more money into the garage than it was worth.

Fields alleges that Bi-State knowingly made false certifications to FTA as a condition precedent to obtaining federal funding in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and that Eager Road, through Musick's influence over Dooley, and Dooley's influence over Bi-State, caused and conspired with Bi-State to make the false certification.

## I.      Eager Road's Motion to Dismiss

Eager Road moves to dismiss the case against it, arguing that Fields has failed to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). Eager Road first argues that Fields has failed to state a Hatch Act claim against Eager Road because Fields does not mention or otherwise make allegations about Eager Road in the context of its Hatch Act claim. Eager Road also argues that Fields's False Claims Act claim should be dismissed because Fields has

not sufficiently pleaded that Eager Road made a false statement to the federal government, that

Eager Road caused Bi-State to make any false statements, or that Eager Road conspired with Bi-

State to make false statements.  Eager Road further argues that the Uniform Relocation Act,

which Fields alleges required Bi-State to get an appraisal of the garage before negotiating for its

purchase, does not apply to Bi-State's purchase of the garage and therefore Bi-State's failure to

get an appraisal cannot be a basis for the alleged false claim.  In addition to seeking dismissal of

the case against it, Eager Road asks me to find that Fields's claims are frivolous and to award

Eager Road reasonable attorney's fees and expenses.

## **Legal Standard**

In ruling on a motion to dismiss, I must accept as true all factual allegations in the

complaint and view them in the light most favorable to the plaintiff.  Fed. R. Civ. P. (12)(b)(6);

Kohl v. Casson, 5 F.3d 1141, 1148 (8th Cir. 1993).  "To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. V. Twombly,

550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

Unlike state courts which often require detailed statements of fact in a petition, the

federal rules require only notice pleading.  Under Fed. R. Civ. P. 8(a):

> [A] complaint must include only a short and plain statement of the claim showing
> that the pleader is entitled to relief.  Such a statement must simply give the
> defendant fair notice of what the plaintiff's claim is and the grounds upon which it
> rests.  This simplified notice pleading standard relies on liberal discovery rules
> and summary judgment motions to define disputed facts and issues and to dispose
> of unmeritorious claims.

Romine v. Acxiom Corp., 296 F.3d 701, 711 (8th Cir. 2002).

Under Federal Rule of Civil Procedure 9(b), allegations of fraud are subject to a heightened pleading requirement. It is undisputed that Rule 9(b) applies to causes of action under the False Claims Act, even if the relator only alleges falsity, not fraud. See United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet Rule 9(b) requirements, a pleading must include "such matters as the time, place and contents of the false representations, as well as the identity of the person making the misrepresentations and what was obtained or given up thereby." Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001). That said, "[t]he special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." Id. Furthermore, the overarching principles of notice pleading dictate that a plaintiff does not need to plead fraud "with complete insight before discovery is complete." Gunderson v. ADM Investor Servs., Inc., 230 F.3d 1363, at *3 (8th Cir. 2000). As a result, Rule 9(b) does not require a plaintiff to set out specific facts concerning matters that are likely solely known by the defendant. See, e.g., Abels, 259 F.3d at 921. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Id. at 920.

**Discussion**

A. Hatch Act

Eager Road argues that Fields has failed to state a claim against it for a violation of the

7

Hatch Act because Fields does not even mention Eager Road in the context of his Hatch Act allegations. Eager Road is correct that the complaint is devoid of any allegations that Eager Road violated the Hatch Act or participated in Bi-State's alleged violation of the Hatch Act. However, I do not construe the complaint as bringing a Hatch Act claim. Rather, I interpret the complaint as alleging that Bi-State's failure to comply with the Hatch Act while representing compliance with federal law on its applications for federal funding is a basis for finding that defendants made false certifications in violation of the False Claims Act. Fields does not address this argument in its response to Eager Road's motion to dismiss. As a result, to the extent that Eager Road is correct and the complaint brings a Hatch Act claim against Eager Road, that claim is dismissed for failure to state a claim.

      B.  <u>False Claims Act</u>

A person violates the False Claims Act, 31 U.S.C. § 3729(a)(1), if he or she: (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] . . . . (C) conspires to commit a violation of subparagraph (A) . . . ." <u>Id.</u> Fields alleges that Eager Road conspired with and caused Bi-State to present a false claim.

      *1.  Section 3729(a)(1)(A): "Causes to be Presented"*

Eager Road argues that Fields has not sufficiently pleaded that it knowingly presented or caused Bi-State to present a false claim to the federal government in violation of § 3729(a)(1)(A) because Fields has not sufficiently alleged causation or knowledge.

        *a.  Causation*

Under the False Claims Act, "[t]he causation standard employs traditional notions of proximate causation 'to determine whether there is a sufficient nexus between the conduct of the

party and the ultimate presentation of the false claim . . . .'" U.S. ex rel. Wuestenhoefer v. Jefferson, No. 4:10-CV-00012-DMB, 2015 WL 226026, at *32 (N.D. Miss. Jan. 16, 2015) (citing U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 714–15 (10th Cir. 2006)).  Under federal law, an act will be deemed a proximate cause of a result if the act is a "substantial factor in the sequence of responsible causation, and if the [result] is reasonably foreseeable or anticipated as a natural consequence." Id. (citing Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23–24 (2d Cir.1990)).  "In a False Claims Act action, to establish causation a relator must show an 'affirmative act' going beyond 'mere passive acquiescence.'" Id. at *33 (citations omitted).  "To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required." Id. (quoting U.S. v. President and Fellows of Harvard Coll., 323 F. Supp. 2d 151, 186–87 (D. Mass. 2004)).

While Fields does not allege that Eager Road specifically asked Bi-State to make false certifications to DOT and FTA, it need not allege such direct action to plead causation.  Fields alleged that Eager Road's principal, Musick, was a contributor to Dooley's re-election campaign and Bi-State's Proposition A campaign.  Fields also alleged that Dooley exerted influence over Bi-State to contract with Eager Road in the first instance and then later to purchase Eager Road's one-third interest in the garage.  Fields further alleged that both transactions were completed for Eager Road's benefit, were completed at a cost above fair market value, and did not provide Bi-State with any additional benefits.  Fields alleged that an appraisal was legally required, that Musick and Bi-State knew that an appraisal was required, but that no appraisal occurred because it would have precluded any sale.  Fields also alleged that, despite Bi-State's failure to obtain an appraisal, it certified to the DOT and FTA that it had obtained an appraisal.  Taking these facts as

true and drawing all reasonable inferences in Fields' favor, Fields has pleaded that Eager Road proximately caused Bi-State to falsely certify compliance with federal requirements. Even where, as here, Rule 9(b) applies, it "does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001).

   *b. Knowledge*

   "To be found liable under the False Claims act, a defendant must act 'knowingly' in submitting a false claim. 31 U.S.C. § 3729(a)(1)(A)-(B). In addition to 'actual knowledge,' 'knowingly' includes 'deliberate indifference' or 'reckless disregard' of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A)(i)-(iii)." United States ex rel. Schell v. Bluebird Media, LLC, No. 12-CV-04019, 2013 WL 3288005, at *4 (W.D. Mo. June 28, 2013). While Rule 9(b) requires a more heightened pleading, "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Abels, 259 F.3d at 920.

   Eager Road argues that Fields has not alleged that Eager Road had knowledge of Bi-State's certification, of the contents of Bi-State's certification, of Bi-State's alleged obligation to obtain an appraisal, of Bi-State's failure to obtain an appraisal, or of Bi-State's obligation to make a certification regarding any such appraisal. However, Fields alleged that Eager Road, through Musick, knew that Bi-State was applying for federal funds, that Bi-State had an obligation to perform an appraisal,[2] and that the purchase price for its one-third interest in the garage could not be supported by an appraisal. Fields alleged that no appraiser could justify

_____

[2] In Fields's response to Eager Road's motion to dismiss, he also argues that Musick knew of the appraisal requirement because he was involved in Bi-State's initial dealings with Eager Road where such appraisals were performed, and then-CEO Salci rejected the contract because the appraisal showed the contract was overpriced.

paying $5.85 million for the garage that he alleges could have been acquired at a tax sale for $600,000. Under the appropriate standards, which merely require that conditions of a person's mind, including knowledge, be alleged generally, I find that Fields has plausibly alleged the knowledge element. See id.

   2.   *Section 3729(a)(1)(C): Conspiracy to Violate the False Claims Act*

   A person violates section 3729(a)(1)(C) of the False Claims Act if he or she "conspires to commit a violation of subparagraph (A) . . . ." Subparagraph (A), as discussed above, makes it unlawful for a person to "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To state a conspiracy claim, a plaintiff must show that there was "an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid" and "at least one act performed in furtherance of that agreement." United States ex rel. Ellis v. City of Minneapolis, No. 11-CV-00416 PJS/TNL, 2014 WL 3928524, at *15 (D. Minn. July 24, 2014). "'Allegations that amount to nothing more than an agreement to act lawfully, cannot be actionable claims under the FCA for conspiracy.'" U.S. ex rel. Hess v. Sanofi-Synthelabo, Inc., No. 4:05CV570MLM, 2006 WL 1064127, at *11 (E.D. Mo. Apr. 21, 2006) (quoting United States ex re. Riley v. St. Luke's Episcopal Hosp., 200 F.Supp.2d 673, 679 (S.D.Tex.2002)) (rev'd on other grounds, 355 F.3d 370 (5th Cir. 2004)).

   Eager Road argues that Fields has not sufficiently alleged the existence of an unlawful agreement. The only agreements discussed in the complaint are an agreement to build the Meridien garage and an agreement to sell an interest in the garage. Eager Road argues that both of these agreements are completely legal and therefore cannot form the basis of a False Claims Act conspiracy claim. Eager Road also argues that Fields's other allegations of a "conspiracy" in

11

the complaint are mere legal conclusions.  Fields's conspiracy allegations are limited to the

following:

> "Baer, Nations, Dooley, and Musick conspired to set the timing for the closing to be in December 2010 so that it would not be disclosed prior to Dooley's November 2010 election, despite the transaction actually being agreed to on or about June 2010, prior to the August 2010 3rd year tax sale by St. Louis County."

Amd. Compl. ¶ 58.

> "In furtherance of this conspiracy to benefit both Eager Road and Musick, Bi-State bought Eager Road's interest in the Meridien [sic] Garage for $5.8 million dollars instead of allowing the property to be sold at tax auction and thereby becoming a secured creditor or owner for less than $600,000."

Id. ¶ 69.

> "Eager Road and Musick conspired with [former Bi-State CEO] Baer, [Bi-State CEO] Nations, and Dooley to defraud taxpayers, regardless of whether they were local or federal, and Eager Road and Bi-State should be jointly held liable for Bi-State's false claims as such claims were made in furtherance of the fraud."

Id. ¶ 72.

I agree with Eager Road that Fields has failed to state a claim for conspiracy under the

requirements of Rule 9(b) because Fields has not alleged the first prong of a conspiracy claim:

that an agreement to get a false claim paid existed.  The only agreements Eager Road is alleged

to have entered into with Bi-State are the facially legal agreements to build the Meridien garage

and to acquire Eager Road's interest in the garage.  As pleaded, these allegations cannot be a

basis for a False Claims Act claim.  See U.S. ex rel. Hess v. Sanofi-Synthelabo, Inc., No.

4:05CV570MLM, 2006 WL 1064127, at *11 (E.D. Mo. Apr. 21, 2006).  Likewise, Fields has not

alleged the identities of anyone making such an agreement, when it was made, the content of the

agreement, or any other specifics as required by Rule 9(b).  Additionally, Fields's allegation that

Bi-State and Dooley conspired to disclose the acquisition after Dooley's campaign is not an

allegation that Bi-State and Eager Road conspired to get a false claim paid. Nor does Fields's allegation that Bi-State purchased Eager Road's share in the Meridien garage in furtherance of the conspiracy allege the existence of an agreement to get a false claim paid. Finally, Fields's allegation that Eager Road and Musick conspired "to defraud taxpayers" does not allege that there was an agreement to get a false claim paid. For these reasons, I find that Fields has failed to state a claim for conspiracy sufficient to meet the pleading requirements of Rule 9(b). As a result, Fields's conspiracy claim against Eager Road will be dismissed.

C. Uniform Relocation Act

Fields has alleged that Bi-State made a false statement to the DOT and FTA when it falsely certified compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act. Fields claims that Bi-State was required to certify compliance with Certification and Assurance Section 1.G "U.S. OMB Assurances." Section 1.G provides: "In acquiring real property, the Applicant will be guided to the greatest extent practicable under State law, by the real property acquisition policies of 42 U.S.C. 4651 and 4652." The Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4651, provides that:

> In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies: . . . . **(2)** Real property shall be appraised before the initiation of negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property, except that the head of the lead agency may prescribe a procedure to waive the appraisal in cases involving the acquisition by sale or donation of property with a low fair market value.

42 U.S.C.A. § 4651.

Eager Road argues that the Uniform Relocation Act does not apply to Eager Road's sale of its interest to Bi-State, but rather the Act's purpose is to protect landowners under threat of condemnation from the government. Because Eager Road and Bi-State negotiated at arm's length, and there was no condemnation issue,[3] Eager Road argues that Bi-State was not required to comply with the Act's appraisal guideline, and therefore, Bi-State's certification of compliance was not false.

The primary purpose of the Uniform Relocation Act is to protect displaced landowners whose property is taken by the federal government. See 42 U.S.C. § 4621 ("The primary purpose of this subchapter is to ensure that [displaced persons] shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on such persons."). However, Section 4651, which sets forth the appraisal guidelines, also states that the purpose is "to promote public confidence in Federal land acquisition practices." Id. § 4651. Fields has alleged that Bi-State was required to certify compliance with the Section 1.G OMB Assurances, which expressly provide that the agency certifying compliance has complied with section 4561 of the Uniform Relocation Act, which in turn states that an appraisal should be obtained before initiating negotiations for the acquisition of real property. Fields further alleges that Bi-State certified compliance with the Act without obtaining an appraisal. Additionally, Fields alleges that the certification was a prerequisite to Bi-State receiving federal funding for its transit projects, including funding for infrastructure and acquisition of support facilities, such as the Meridien garage.

---

[3] Although Eager Road argues that the Uniform Relocation Act does not apply to Bi-State's acquisition of Eager Road's share in the Meridien garage because there was no land condemnation, Fields (albeit unclearly) alleges in the complaint that Bi-State condemned land to build the garage.

The False Claims Act recognizes two types of claims – factually false claims and legally false claims. Factually false claims generally involve claims that a "government payee has submitted 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217-18 (10th Cir. 2008) (internal citations omitted). Claims of legal falsity, on the other hand, allege that the defendant has "certifie[d] compliance with a statute or regulation *as a condition* to government payment," yet knowingly failed to comply with such statute or regulation. Id. (emphasis in original) (internal citations omitted).

There are two theories under which a plaintiff can bring a claim for legal falsity – express false certification and implied false certification. Id. "An express false certification theory applies when a government payee 'falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment.'" Id. (citing Mikes, 274 F.3d at 698). "This promise may be any false statement that relates to a claim, whether made through certifications on invoices or any other express means." See U.S. ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1172 (9th Cir. 2006). "Under an implied false certification theory, by contrast, courts do not look to the contractor's actual statements; rather, the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." Id. at 1218.

Fields appears to be asserting a legal falsity claim under an express false certification theory. Assuming Fields is correct and Bi-State was required to certify compliance with the Uniform Relocation Act in this instance, as prescribed by its continuing certification obligations under Section 1.G of the OMB, then, taking Fields's factual allegations as true, Fields has stated

15

a claim under federal notice pleading standards.[4]  Moreover, even if Fields is incorrect and

Section 1.G of the OMG did not require Bi-State to certify compliance with the Uniform

Relocation Act because the purpose of the Act, and therefore the Act's requirements, did not

apply to this situation that does not involve the taking of property from a landowner, I still

cannot say that Fields has not stated a claim.  That is because, even if Bi-State's interpretation of

the Uniform Relocation Act is correct, Fields might still have a claim for factual falsity.  Eager

Road has not disputed that Bi-State certified compliance with the Act.  Nor does Eager Road

dispute that the Act states that, where practicable, real property shall be appraised before

negotiating for its acquisition.  As a result, Fields has stated a claim.

For all of these reasons, I will grant in part and deny in part Eager Road's motion to

dismiss.  Eager Road's motion to dismiss is denied, except to the extent Fields asserts a Hatch

Act claim against Eager Road, which will be dismissed, and to the extent that Fields's False

Claims Act claim against Eager Road is premised on a theory of conspiracy.  As a result, I will

also deny Eager Road's request for attorney's fees and expenses.

## II.　　**Bi-State's Motion for Summary Judgment**

Defendant Bi-State seeks summary judgment on all claims in its favor.  Bi-State argues

that it is entitled to summary judgment because Bi-State is not a suable "person" for purposes of

False Claims Act *qui tam* liability.

### **Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to

the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that

---

[4] I need not, and therefore will not, determine whether Fields is correct that Bi-State was legally required to certify compliance with the Uniform Relocation Act because I conclude that Fields has at least sufficiently stated a claim under a factual falsity theory.  See infra.

16

the moving party is entitled to judgment as a matter of law.  Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)).  The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof.  Id. at 324.  In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy.  Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

### Discussion

The False Claims Act imposes liability on "any person" who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a).  While there is no statutory definition in the False Claims Act for "person," the United States Supreme Court has held that, under the Act, states and state agencies are not "persons" subject to liability under the Act.  Vermont Agency of Natural Resources v. U.S. ex rel. Stevens, 529 U.S. 765, 787-88 (2000).  Local governments, however, are "persons" for False Claims Act liability purposes.  Cook County, Ill. v. U.S. ex rel. Chandler, 538 U.S. 119, 122 (2003).  To determine whether an entity is a state agency or a local government for False Claims Act purposes, courts generally employ the "arm of the state" analysis used for purposes of determining Eleventh Amendment immunity.

See, e.g., U.S. ex rel. Lesinski v. S. Florida Water Mgmt. Dist., 739 F.3d 598, 602 (11th Cir. 2014) (collecting circuit court cases).

Bi-State is a body corporate and politic created and existing by reason of a joint compact between the States of Missouri and Illinois and ratified by the United States Congress.  See RSMo. § 70.370.1; 45 Ill. Comp. Stat. 110/1; Joint Resolutions of the United States Congress of August 31, 1950, 64 Stat. 568, Pub. L. No. 81-743; September 21, 1959, 73 Stat. 582, Pub. L. No. 86-303; September 30, 1985, 99 Stat. 477, Pub. L. No. 99-106; April 1, 1996, 110 Stat. 883, Pub. L. No. 104-125; December 19, 2011, 125 Stat. 775, Pub. L. No. 112-71.  Where, as here, an entity is the creation of an interstate compact occurring through the consent of Congress, there is typically multi-state as well as federal jurisdiction over the entity.  Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 40 (1994).  As a result, in such cases, it is presumed that the entity is *not* an arm of the state.  See Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 43-44 (1994) (citing Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401 (1979)) ("We would presume the Compact Clause agency does not qualify for Eleventh Amendment immunity "[u]nless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose.").

In Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp., 948 F.2d 1084 (8th Cir. 1991), the United States Court of Appeals for the Eighth Circuit considered whether Bi-State should be treated like an arm of the state or a local government for purposes of determining Eleventh Amendment immunity, and held that Bi-State was not an arm of the state, but rather, was more like a local government.  Id. at 1088.  The Illinois Supreme Court has also held that Bi-

State should be characterized as a local government entity.  See Hubble v. Bi-State Dev. Agency of Illinois-Missouri Bi-State. Dist., 238 Ill. 2d 262, 268 (2010).

Based on these decisions, Fields argues that the rule of res judicata compels me to also hold that Bi-State is a local rather than state entity.  However, in holding that Bi-State is not an arm of the state for Eleventh Amendment immunity purposes, the Barket Court noted that, "[t]here is no litmus test to determine whether a bistate agency is more like an arm of the compacting states or more like a local governmental entity."  Id. at 1086.  "Instead, courts decide the question on the facts of each case by considering several criteria."  Id.  As a result, I will use the Barket criteria to analyze whether Bi-State is more like an arm of the compacting states or more like a local governmental entity under the facts of this case.[5]

The relevant facts are as follows.  Bi-State's jurisdiction includes the Counties of St. Louis County, St. Louis City, St. Charles, and Jefferson in Missouri, and the Counties of Madison, St. Clair, and Monroe in Illinois.  RSMo. §70.730, art. II; 45 Ill. Comp. Stat. 100/1, art. II.  Among other things, Bi-State is authorized to plan, construct, own, operate and maintain public transit systems, airports, industrial parks, parking facilities and wharves, and to plan, coordinate, and implement development projects in the region.  RSMo. § 70.730, art. III; 45 Ill. Comp. Stat. 100/1, art. III, and 110/1.  Bi-State's mission is to meet the needs and priorities of the region as the operator of the public transit system and also as the consensus developer of public works and development projects.  See Affidavit of John Nations, ¶ 3.  Defendant Bi-State owns and operates the St. Louis metropolitan area's public transit system, which currently

---

[5] Bi-State suggests that I should conduct the arm of the state analysis using the Eleventh Circuit's four-factor balancing test, as applied in U.S. ex rel. Lesinski v. S. Florida Water Mgmt. Dist., 739 F.3d 598 (11th Cir. 2014), rather than the Eighth Circuit's six-factor balancing test.  As I am bound by Eighth Circuit precedent, I will apply the six factors as laid out in Barket, 948 F.2d 1084 (8th Cir. 1991).  I note, however, that although the two courts label the factors slightly differently, the analysis is not significantly different under either court's approach.

includes 87 light rail vehicles, 394 buses, and 120 vans.  See id. ¶ 4.  Bi-State also owns and

operates the St. Louis Downtown Airport and the Gateway Arch Riverboats, and operates the

Gateway Arch Transportation System, which is the tram system to the top of the Gateway Arch.

See id. ¶ 5.

Defendant Bi-State is governed by a board of ten commissioners: five from Missouri and

five from Illinois.  See RSMo. § 70.370, art. IV; RSMo. § 70.380; 45 Ill. Comp. Stat. 100/1, art.

IV; 45 Ill. Comp. Stat. 105/1.  The Missouri commissioners are appointed by the Governor of the

State of Missouri with the advice and consent of the Missouri Senate.  See RSMo. § 70.380.

Beginning with the appointment to be filled in January 2004, the Illinois commissioners are

appointed alternately by the Chairman of the County Board of the County of Madison or the

County of St. Clair, with the advice and consent of the respective County Board.  See 45 Ill.

Comp. Stat. 105/2(a)-(b).  Both the State of Missouri and the State of Illinois have reserved "the

right to provide by law for the exercise of the veto power by the governor thereof over any action

of any commissioner appointed therefrom."  See RSMo. §70.370, art. V; 45 Ill. Comp. Stat.

100/1, art. V.  The public transit system is Defendant Bi-State's largest operating division and its

capital costs and operations are funded through a combination of transit fare and local, state, and

federal assistance.  See Affidavit of John Nations, ¶ 6; Affidavit of Kathy Klevorn, ¶ 3.

A.  The Barket Factors

Barket instructs courts to consider the following factors to determine whether an entity is

more like a local government or an arm of the state for Eleventh Amendment immunity

purposes:

> (1)whether the compacting states characterize the agency as an arm of the
> compacting states or as a local governmental entity; (2) whether the

compacting states fund the agency; (3) whether the compacting states are financially responsible for the liabilities and obligations the agency incurs; (4) whether the agency's commissioners are appointed by the compacting states or by local governments; (5) whether the functions the agency performs are traditionally state or municipal; and (6) whether the compacting states can veto the agency's actions.

Id.

### 1. Characterization of Agency

The first <u>Barket</u> factor is whether the compacting states characterize Bi-State as an arm of the compacting states or a local government entity. <u>Barket</u> concluded that state law treats Bi-State like a county or municipality. <u>Id.</u> at 1087. <u>Barket</u> explained:

> [S]tate law treats Bi–State like a county or municipality. The compact characterizes Bi–State as "a body corporate and politic," Mo.Rev.Stat. § 70.370 art. III, which indicates Bi–State is a municipal corporation subject to suit under section 1983. *See Port Auth.,* 819 F.2d at 415; *see also Feeney,* 873 F.2d at 631. The compact provides Bi–State's property possesses the same status as property belonging to cities for the purpose of state taxation. Mo.Rev.Stat. § 70.375; Ill.Rev.Stat. ch. 127, ¶ 63s–10. Bi–State is subject to Missouri's motor fuel and special fuel taxes. *Bi–State Dev. Agency v. Director of Revenue,* 781 S.W.2d 80, 84 (Mo.1989) (en banc). Furthermore, the Missouri legislature characterizes Bi–State as a municipal corporation for the purpose of common law immunity. *See* Mo.Rev.Stat. § 537.600.4 (Supp.1990); *State ex rel. Trimble v. Ryan,* 745 S.W.2d 672, 674 (Mo.1988) (en banc). Similarly, an Illinois Appellate Court characterized Bi–State as a local public entity under the Illinois tort immunity act. *Grady v. Bi–State Dev. Agency,* 151 Ill.App.3d 748, 104 Ill.Dec. 427, 429, 502 N.E.2d 1087, 1089 (1986). Although the Missouri legislature assigned Bi–State to the Missouri Department of Transportation, Mo.Rev.Stat. § 226.007.2 (1986), this falls far short of conferring agency status on Bi–State. *See Fitchik,* 873 F.2d at 662, 664 (holding entity created by state transportation act was not an arm of the state).

<u>Id.</u> at 1087 (internal citations omitted).

After <u>Barket</u> was decided, the Missouri legislature removed language from Missouri's sovereign immunity statute which had declared that there was no immunity for the proprietary functions of multi-state compact agencies. <u>See</u> RSMo. § 537.600; Mo. H.B. 58 § A (2005). Bi-

State argues that this change indicates that Bi-State is a "public entity" entitled to state sovereign immunity. The legislature's removal of this language could be interpreted to show that it intended to provide interstate compact agencies like Bi-State with sovereign immunity protection. However, the legislature is presumed to amend a statute with knowledge of judicial decisions interpreting that statute. Hubble, 238 Ill. 2d at 273-74. Accordingly, I presume that the Missouri legislature knew of Barket's interpretation of the statute as supporting a finding that Bi-State is more like a local government entity. Therefore, the legislature's failure to expressly state that interstate compact entities performing proprietary functions, such as Bi-State, should now be immune for state torts indicates the legislature's acquiescence to Barket's holding. Additionally, except for the finding that the Missouri legislature characterizes Bi-State as a municipal corporation for the purpose of common law immunity, each of the other reasons set out in Barket for finding that the compacting states characterize Bi-State as a local government rather than an arm of the state apply with equal force here. For these reasons, I conclude that this factor weighs slightly in favor of finding that the compacting states characterize Bi-State as a local government entity.[6]

### 2. Funding

The second Barket factor is whether the compacting states fund Bi-State. Barket concluded that "the compact's contemplation of local funding suggests that [Bi-State] is not an arm of Missouri and Illinois." Barket, 948 F.2d at 1087. As Barket reasoned:

> [T]he compact makes no specific provision for state funding of Bi-State. Bi-State is self-funding. The compact authorizes several methods for Bi-State to generate

---

[6] While I conclude that this factor weighs slightly in favor of finding that the compacting states do not characterize Bi-State as an arm of the state, even if I concluded otherwise based on the Missouri legislature's 2005 amendment of RSMo. § 537.600, this factor is not dispositive, nor would it outweigh the balance of the factors that as a whole suggest that Bi-State is not an arm of the state.

operating revenue. Bi–State has no taxing power, Mo.Rev.Stat. § 70.370 art. VI, but can collect fees and issue revenue bonds, *id.* art. III(3)–(4). In addition, Bi–State can "receive for its lawful activities any contributions or moneys appropriated by municipalities, counties, state or other political subdivisions or agencies[,] or by the federal government or any agency." *Id.* art. III(5). Under this provision, Bi–State receives local sales tax money for the operation of the St. Louis public bus system. *See* Mo.Rev.Stat. §§ 94.600–.655 (1986); Op.Mo.Att'y Gen. No. 13 (1987).

Id.

Bi-State argues that although the compact does not provide for state funding, in reality, Bi-State does receive funding from both Missouri and Illinois. Bi-State argues that from 2009 to 2014, its revenues from "farebox recovery" only averaged 21.1 percent of Bi-State's operating revenue. Bi-State also receives funding from various city and county tax appropriations in Missouri and Illinois. Bi-State argues that because these funds are levied pursuant to state transportation tax laws, these funds are a "direct result" of the Missouri and Illinois state legislatures. However, the tax scheme was no different when the Eighth Circuit decided <u>Barket</u> and therefore, although not expressly, it likely rejected the same premise. Furthermore, funding appropriated by the local municipalities does not become state funding just because the enabling local taxation scheme was created by the state legislatures. And even if I were to reach such a conclusion, it would not outweigh the other <u>Barket</u> considerations that as a whole suggest that Bi-State is self-funding rather than state-funded. As a result, this factor also weighs in favor of finding that Bi-State is characterized as a local government.

*3. Financial Responsibility for the Agency's Liabilities and Obligations*

The third <u>Barket</u> factor is whether the compacting states are financially responsible for the liabilities and obligations of Bi-State. The Supreme Court has held that this factor is the most important factor in an Eleventh Amendment inquiry. <u>Hess</u>, 513 U.S. 30 at 48-49 (favorably

citing <u>Barket</u>, 948 F.2d at 1087).  <u>Barket</u> recognized the importance of this factor and held that this factor weighed against characterizing Bi-State as a state of the arm entitled to Eleventh Amendment immunity.  <u>Barket</u>, 948 F.2d at 1087.

Here, "the compact does not state or even suggest that Missouri and Illinois are responsible for judgments against Bi–State."  <u>Id.</u>  Bi-State acknowledges that the states are not liable for judgments against Bi-State and that Bi-State is self-insured, but argues that, if judgment creditors were to deplete Bi-State's funds to the point where it could no longer function, Missouri and Illinois would have to choose between increasing their appropriations or shirking their mutual pledge to one another for "the future planning and development of the bi-state metropolitan district, holding in high trust for the benefit of its people and the nation the special blessings and natural advantages thereof" and the compact's mandate that Bi-State "proceed…as rapidly as may be economically practicable" to fulfill its duties.  Because of these duties, Bi-State contends that the states would likely intervene to preserve Bi-State's functionality in such a situation, and therefore, Bi-State is more like an arm of the state.  <u>Barket</u> considered this same argument and rejected it.  <u>See</u> <u>Barket</u>, 948 F.2d at 1087 ("The possibility of voluntary appropriation of state funds, however, does not trigger sovereign immunity.").  In rejecting this functional liability argument, the <u>Barket</u> court reasoned that the purpose of extending Eleventh Amendment immunity to state agencies is "to protect the state treasury from liability that would have [ ] essentially the same practical consequences as a judgment against the [s]tate itself."  <u>Id.</u> (quoting <u>Lake Country</u>, 440 U.S. at 400–01).  <u>Barket</u> concluded that "[b]ecause Missouri and Illinois are not liable for judgments against Bi–State, there is no policy reason for extending the states' sovereign immunity to Bi–State."  <u>Barket</u>, 948 F.2d at 1087.  I

24

agree and find that this factor also weighs in favor of finding that Bi-State is more like a local government than an arm of the state.

   *4.  Appointment of Commissioners*

   The fourth <u>Barket</u> factor is whether Bi-State's commissioners are appointed by the compacting states or by local government.  Bi-State is governed by a board of ten commissioners: five from Missouri and five from Illinois.  The Missouri commissioners are appointed by the Governor of the State of Missouri with the advice and consent of the Missouri Senate.  RSMo. § 70.380.  Two of the Missouri commissioners are appointed by the Governor from a panel of three nominees submitted by the Mayor of the City of St. Louis, and two of the Missouri commissioners are appointed by the Governor from a panel of three nominees submitted by the County Executive of St. Louis County.  RSMo. § 70.385.1.  One Missouri commissioner is appointed by the Governor from a panel of three nominees submitted alternately by the Mayor of the City of St. Louis and the County Executive of St. Louis County.  RSMo. § 70.385.2.

   The Illinois commissioners are appointed alternately by the Chairman of the County Board of the County of Madison or the County of St. Clair, with the advice and consent of the respective County Board.  45 Ill. Comp. Stat. 105/2(a), (b).  The appointments of the four remaining Illinois commissioners then continue to alternate between St. Clair and Madison County so that St. Clair and Madison County each appoint two Illinois commissioners.  45 Ill. Comp. Stat. 105/2(c).  These commissioners each serve for a term of five years.  45 Ill. Comp. Stat. 105/2.

Barket held that the governors' power to appoint commissioners weighs in favor of finding that Bi-State is an arm of the state. Barket, 948 F.2d at 1087. At time of Barket, however, both Missouri and Illinois Governors appointed respective commissioners. Id. Although the Illinois Governor no longer appoints the State's respective Agency commissioners, the fact that the Missouri Governor does have the power to appoint the State's respective Agency commissioners with the advice and consent of the Missouri Senate still tends to suggest that Defendant Bi-State is an arm of the state. As a result, this factor weighs slightly in favor of finding that Bi-State is an arm of the state.

5. *Agency Functions*

The fifth Barket factor is whether the functions that Bi-State performs are traditionally state or municipal. Barket found that Bi-State performs primarily traditional municipal functions. Id. at 1088. Barket reasoned that, while transportation facilitation is usually considered a state function, where, as here, it is limited to a certain geographic area (the St. Louis region), the functions are more like those of a municipality. Id. Bi-State argues that its functions today are quite different from what they were at the time of Barket, which were primarily the operation of public buses. Today, Bi-State operates the entirety of the Transit System (including Metrolink), the St. Louis Downtown Airport, and the Gateway Arch Riverboats, and the Gateway Arch tram. Bi-State also argues that, although it has the authority to coordinate and implement development projects in the region, its development plans are subject to the states' approval. See RSMo. § 70.370, art. III; 45 Ill. Comp. Stat. 100/1, art. III. It is true that Bi-State's operations have increased in scope since Barket was decided in 1991. Even with the greater range of operations, however, by Bi-State's own admission it is still primarily

functioning as a transportation provider in the St. Louis area.  Additionally, the fact that Bi-State's plans are subject to state approval does not diminish the fact that its activities are best characterized as traditionally municipal in nature.  As a result, I find that Bi-State's functions remain primarily those that are traditionally local.

6. *Veto Power*

The sixth <u>Barket</u> factor is whether the compacting states can veto Bi-State's actions.  As recognized by <u>Barket</u>, the veto power reserved by the states, the requirement that Bi-State submit an annual report to the Governors, and the right of the states to approve Bi-State's development plans, rules and regulations, all support the conclusion that Bi-State is an arm of the state. <u>Barket</u>, 948 F.2d at 1088.

7. *Balance of the Factors*

In sum, the balance of the factors, and, in particular, the question of whether the compacting states are liable for judgments brought against Bi-State, suggest that Bi-State should be characterized as a local government rather than an arm of the state for the purpose of determining whether it is a "person" subject to liability under the False Claims Act.  In addition to being supported by the overwhelming majority of the <u>Barket</u> factors, this finding is also consistent with Missouri and Illinois state as well as federal court decisions.  As a result, I find that Bi-State is a suable "person" in this context and I will deny Bi-State's motion for summary judgment.

## <u>Conclusion</u>

For the reasons stated above, I will grant in part and deny in part Defendant Eager Road's motion to dismiss, and I will deny Defendant Bi-State's motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED that** defendant Eager Road and Associates, LLC's motion to dismiss #[34] is **GRANTED** in part and **DENIED** in part. The motion is denied except to the extent that the complaint asserts claims against Eager Road for a Hatch Act violation or for a violation of the False Claims Act under a conspiracy liability theory.

**IT IS FURTHER ORDERED** that defendant Bi-State's motion for summary judgment #[44] is **DENIED**.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2015.